# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of:<br>Information associated with account subscriber<br>number identified as 871265 that is within the<br>possession, custody, or control of Rackspace US, Inc. | Case No.   2:20-MJ-3177 |

## APPLICATION FOR WARRANT BY TELEPHONE PURSUANT TO 18 U.S.C. § 2703

I, a federal law enforcement officer, request a warrant pursuant to Title 18, United States Code, Section 2703, and state under penalty of perjury that I have reason to believe that within the following data:

*See Attachment A*

There are now concealed or contained the items described below:

*See Attachment B*

The basis for the search is:

☒ Evidence of a crime;
☒ Contraband, fruits of crime, or other items illegally possessed;
☐ Property designed for use, intended for use, or used in committing a crime.

The search is related to a violation of:

| *Code section(s)* | *Offense Description* |
|---|---|
| 7 U.S.C §§ 136j(a)(1)(A) and (E), 136l(b)(1) | Sale or distribution in the United States of an unregistered and misbranded pesticide |

The application is based on these facts:

*See attached Affidavit, which is incorporated herein by reference.*

_____
*Applicant's signature*

Wendy Su, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   _____July 10, 2020_____

_____
*Judge's signature*

City and State: _____      Hon. John E. McDermott, U.S. Magistrate Judge
*Printed name and title*

AUSA: J. Johns (213-503-1690) and M. Williams (ext. 3359)

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

This warrant applies to information associated with the SUBJECT ACCOUNT identified by the subscriber number 871265 that is within the possession, custody, or control of Rackspace US, Inc., a company that accepts service of legal process at 1 Fanatical Place, City of Windcrest, San Antonio, Texas 78218, regardless of where such information is stored, held, or maintained.

<u>**ATTACHMENT B**</u>

**ITEMS TO BE SEIZED**

I.    <u>**SEARCH PROCEDURES**</u>

1.    The warrant will be presented to personnel of Rackspace US, Inc. (the "PROVIDER"), who will be directed to isolate the information described in Section II below.

2.    To minimize any disruption of service to third parties, the PROVIDER's employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the information described in Section II below.

3.    The PROVIDER's employees will provide in electronic form the exact duplicate of the information described in Section II below to the law enforcement personnel specified below in Section IV.

4.    With respect to contents of wire and electronic communications produced by the PROVIDER (hereafter, "content records," see Section II.10.a. below), law enforcement agents and/or individuals assisting law enforcement and acting at their direction (the "search team") will examine such content records pursuant to search procedures specifically designed to identify items to be seized under this warrant.  The search shall extract and seize only the specific items to be seized under this warrant (see Section III below).  The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.  The review of the electronic data may

i

be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.    If the search team encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

6.    The search team will complete its search of the content records as soon as is practicable but not to exceed 120 days from the date of receipt from the PROVIDER of the response to this warrant.  The government will not search the content records beyond this 120-day period without first obtaining an extension of time order from the Court.

7.    Once the search team has completed its review of the content records and created copies of the items seized pursuant to the warrant, the original production from the PROVIDER will be sealed -- and preserved by the search team for authenticity and chain of custody purposes -- until further order of the Court.  Thereafter, the search team will not access the data

from the sealed original production which fell outside the scope of the items to be seized absent further order of the Court.

8.   The special procedures relating to digital data found in this warrant govern only the search of digital data pursuant to the authority conferred by this warrant and do not apply to any search of digital data pursuant to any other court order.

9.   Pursuant to 18 U.S.C. § 2703(g) the presence of an agent is not required for service or execution of this warrant.

## II.   INFORMATION TO BE DISCLOSED BY THE PROVIDER

10.   To the extent that the information described in Attachment A is within the possession, custody, or control of the PROVIDER, regardless of whether such information is located within or outside of the United States, including any information that has been deleted but is still available to the PROVIDER, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose the following information to the government for each SUBJECT ACCOUNT listed in Attachment A:

a.   All contents of all wire and electronic communications associated with the SUBJECT ACCOUNT, limited to that which occurred on or after January 1, 2020,[13] including:

i.   All files and settings associated with the SUBJECT ACCOUNT, including preserved and current images,

---

[13] To the extent it is not reasonably feasible for the PROVIDER to restrict any categories of records based on this date restriction (for example, because a date filter is not available for such data), the PROVIDER shall disclose those records in its possession at the time the warrant is served upon it.

communication and connection logs, and information used to login or gain access to the servers, and including capture of data stored in volatile memory;

ii.  All records pertaining to communications between the PROVIDER and any person regarding the SUBJECT ACCOUNT, including contacts with support services and records of actions taken; and

iii. All stored passwords, including passwords stored in clear text and hash form, and for any hashed values that include a salt, the PROVIDER shall provide the salt value used to compute the stored password hash value, and any security questions and answers.

b.   All other records and information, including:

i.   All subscriber information, including the date on which the account was created, the length of service, the IP address used to register the account, the subscriber's full name(s), screen name(s), any alternate names, other account names or e-mail addresses associated with the account, linked accounts, telephone numbers, physical addresses, and other identifying information regarding the subscriber, including any removed or changed names, email addresses, telephone numbers or physical addresses, the types of service utilized, account status, account settings, login IP addresses associated with session dates and times, as well as means and source of payment, including detailed billing records, **and including any changes made to any subscriber information** or services, including specifically changes made to secondary e-mail accounts, phone

numbers, passwords, identity or address information, or types of services used, and including the dates on which such changes occurred, for the following accounts:

> (I)  the SUBJECT ACCOUNT.

ii.  All user connection logs and transactional information of all activity relating to the SUBJECT ACCOUNT described above in Section II.10.a., including all log files, dates, times, durations, data transfer volumes, methods of connection, IP addresses, ports, routing information, dial-ups, and locations, and including specifically the specific product name or service to which the connection was made.

## III. <u>INFORMATION TO BE SEIZED BY THE GOVERNMENT</u>

11.  For each SUBJECT ACCOUNT listed in Attachment A, the search team may seize:

a.  All information described above in Section II.10.a. that constitutes evidence, contraband, fruits, or instrumentalities of violations of 7 U.S.C §§ 136j(a)(1)(A) and (E), 136l(b)(1), namely:

i.   Information relating to who created, accessed, or used the SUBJECT ACCOUNT, including records about their identities and whereabouts.

ii.  Documents and records referring or relating to the purchase, manufacture, compounding and/or processing of MAQUAT 10, QUAT, sanitizer, QUAT Solution, or other unregistered or misbranded pesticide products by or on behalf of OCCS or Ultra Clean.

iii. Documents and records referring or relating to the purchase of chemicals and/or other ingredients such as alkyl dimethyl benzyl ammonium chloride, alkyl dimethyl ethylbenzyl ammonium chloride, or any other unregistered or misbranded pesticide products.

iv. Documents and records referring or relating to efficacy claims for MAQUAT 10, QUAT, sanitizer, or QUAT Solution, such as microbiological analysis or other laboratory testing results and reports.

v. Documents and records referring or relating to the labeling, packaging, or repackaging of MAQUAT 10, QUAT, sanitizer, or QUAT Solution, or other unregistered or misbranded pesticide products manufactured by or on behalf of OCCS or Ultra Clean.

vi. Documents and records referring or relating to marketing, advertising, sales or product representations for MAQUAT 10, QUAT, sanitizer, or QUAT Solution, or other unregistered or misbranded pesticide products manufactured by or on behalf of OCCS or Ultra Clean.

vii. Documents and records referring or relating to the distribution, sale, transportation, and delivery of MAQUAT 10, QUAT, sanitizer, or QUAT Solution, or other unregistered or misbranded pesticide products manufactured by or on behalf of OCCS or Ultra Clean.

viii. Documents related to State of California and/or federal rules and regulations applicable to the manufacture, sale, distribution, and shipment of pesticides.

ix.   Documents and records that show which entity of individuals own, control, or manage OCCS, such as rental or lease agreements, mortgage documents, rental or lease payments, and utility or telephone bills.

b.   All records and information described above in Section II.10.b.

**IV.   <u>PROVIDER PROCEDURES</u>**

12.   IT IS ORDERED that the PROVIDER shall deliver the information set forth in Section II within 10 days of the service of this warrant.   The PROVIDER shall send such information to:

> Special Agent Wendy Su
> 75 Hawthorne Street, CID-1
> San Francisco, CA 94105
> Phone: (415) 947-4554 / Fax: (415) 947-4559
> Email: su.wendy@epa.gov

13.   IT IS FURTHER ORDERED that the PROVIDER shall provide the name and contact information for all employees who conduct the search and produce the records responsive to this warrant.

**AFFIDAVIT**

I, Wendy Su, being duly sworn, declare and state as follows:

## I.   INTRODUCTION

1.   I am a Special Agent ("SA") with the United States Environmental Protection Agency ("EPA"), Criminal Investigation Division ("EPA-CID"), and have been since September 2010. I have a Master's degree in Environmental Science and Management from the University of California Santa Barbara, and a Bachelor's degree in Sociology and Geography/Environmental Studies from the University of California Los Angeles. I have completed training at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia, which included the Criminal Investigator Training Program, the EPA-CID Environmental Investigation Basic Training Program, and the Economic Crimes Investigation and Analysis Training Program. In addition, I have received both formal and informal training from FLETC and other institutions regarding computer-related investigations and computer technology. I am charged with investigating environmental crimes including violations of the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA"), 7 U.S.C. §§ 136 et seq., and Title 18 crimes such as wire fraud, false statements, conspiracy, and obstruction of justice. These investigations have often included the execution of search warrants. Pursuant to 18 U.S.C. § 3063, Special Agents of EPA-CID are authorized to apply for and serve search warrants. I have participated in the execution of numerous search warrants involving violations of federal environmental statutes. I have been the lead investigator and/or

co-investigator in various criminal investigations for
violations of environmental laws.

    2.    I make this affidavit in support of an application for
a warrant for information associated with the subscriber account
identified by the number 871265 (the "SUBJECT ACCOUNT") that is
stored at premises controlled by Rackspace US, Inc. (the
"PROVIDER"), a provider of electronic communication and remote
computing services, headquartered at 1 Fanatical Place, City of
Windcrest, San Antonio, Texas 78218.[1] The information to be
searched is described in Attachment A. This affidavit is made in
support of an application for a warrant under 18 U.S.C.
§§ 2703(a), 2703(b)(1)(A), 2703(c)(1)(A) and 2703(d)[2] to require

---

    [1] Because this Court has jurisdiction over the offense(s)
being investigated, it may issue the warrant to compel the
PROVIDER pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A).
See 18 U.S.C. §§ 2703(a) ("A governmental entity may require the
disclosure by a provider . . . pursuant to a warrant issued
using the procedures described in the Federal Rules of Criminal
Procedure . . . by a court of competent jurisdiction") by 2711
("the term 'court of competent jurisdiction' includes -- (A) any
district court of the United States (including a magistrate
judge of such a court) or any United States court of appeals
that -- (i) has jurisdiction over the offense being
investigated; (ii) is in or for a district in which the provider
of a wire or electronic communication service is located or in
which the wire or electronic communications, records, or other
information are stored; or (iii) is acting on a request for
foreign assistance pursuant to section 3512 of this title").

    [2] The government is seeking non-content records pursuant to
18 U.S.C. § 2703(d).  To obtain the basic subscriber
information, which does not contain content, the government
needs only a subpoena.  See 18 U.S.C. § 2703(c)(1), (c)(2).  To
obtain additional records and other information--but not
content--pertaining to subscribers of an electronic
communications service or remote computing service, the
government must comply with the dictates of section
2703(c)(1)(B), which requires the government to supply specific
and articulable facts showing that there are reasonable grounds
to believe that the records or other information sought are

the PROVIDER to disclose to the government copies of the information (including the content of communications) described in Section II of Attachment B. Upon receipt of the information described in Section II of Attachment B, law enforcement agents and/or individuals assisting law enforcement and acting at their direction will review that information to locate the items described in Section III of Attachment B. Attachments A and B are incorporated herein by reference.

3. As described more fully below, I respectfully submit there is probable cause to believe that the information associated with the SUBJECT ACCOUNT constitutes evidence, contraband, fruits, or instrumentalities of criminal violations of 7 U.S.C §§ 136j(a)(1)(A) and (E), 136l(b)(1) (the sale or distribution in the United States of an unregistered and misbranded pesticide).

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all

---

relevant and material to an ongoing criminal investigation in order to obtain an order pursuant to 18 U.S.C. § 2703(d). The requested warrant calls for both records containing content (<u>see</u> Attachment B paragraph II.10.a.) as well as subscriber records and other records and information that do not contain content (<u>see</u> Attachment B paragraph II.10.b.).

conversations and statements described in this affidavit are related in substance and in part only.

## II.  <u>THE FIFRA FRAMEWORK</u>

5.   FIFRA regulates, in relevant part, the sale and distribution of all pesticides sold or distributed in the United States. All pesticides sold or distributed in the United States must be registered with EPA. 7 U.S.C. § 136a(a).

6.   Under FIFRA, the term "pesticide" is defined, in relevant part, as ". . . any substance or mixture of substances intended for preventing, destroying, repelling, or mitigating any pest . . ." 7 U.S.C. § 136(u). The term "pest" means ". . . any insect, rodent, nematode, fungus, weed . . . or any other form of terrestrial or aquatic plant or animal life, or virus, bacteria or other micro-organism . . ." 7 U.S.C. § 136(t). The term "active ingredient" means, in relevant part, "an ingredient which will prevent, destroy, repel, or mitigate any pest." 7 U.S.C. § 136(t).

7.   Under FIFRA, the term "producer" is defined as a ". . . person who manufactures, prepares, compounds, propagates or processes any pesticide . . . or active ingredient in producing a pesticide."  7 U.S.C. § 136(w). The term "produce" means "to manufacture, prepare, compound, propagate, or process any pesticide . . . or active ingredient used in producing a pesticide . . . ." 7 U.S.C. § 136(w).

8.   Under FIFRA, the term "label" is defined as the written, printed, or graphic matter on, or attached to, the

pesticide or any of its containers or wrappers. 7 U.S.C.
§ 136(p).

9.    FIFRA provides that a pesticide is misbranded, in
relevant part, if its label (i) bears any statement, design or
graphic representation which is false or misleading in any
particular, (ii) does not conform to EPA standards, or (iii)
does not bear the EPA establishment registration number. 7
U.S.C. § 136(q).

10.    Before selling or distributing a pesticide in the
United States, the producer (or registrant) must obtain a
"registration number" by submitting to EPA for its review
information that includes the pesticide formula, the proposed
product's use, the proposed label (such as warnings and
directions), and data supporting pesticidal claims. 7 U.S.C. §
136a(c). In addition, efficacy tests must be conducted on each
proposed product in order to ascertain through testing that the
product performs in accordance with its labeling and use
directions claims.

11.    Each registration number is specific to a particular
pesticide formula that has been issued to a particular
registrant. The registration number is valid only for the
particular pesticide formula produced by the registrant or its
EPA-registered licensee. Producers must also obtain an
"establishment number" by registering the location where the
registered pesticide is produced in order to facilitate
inspections. 7 U.S.C. § 136e.

12.   All pesticides sold or distributed in the United States must bear an EPA-approved label that sets forth, in relevant part, the EPA pesticide registration number, the EPA establishment registration number identifying where the pesticide was produced, the net contents, an ingredient statement, and directions and warnings for safe use. 40 C.F.R. § 156.10.

13.   Under FIFRA, it is unlawful for any person to distribute or sell in the United States any pesticide that (i) is not registered with EPA (7 U.S.C. § 136j(a)(1)(A)), or (ii) is misbranded (7 U.S.C. § 136j(a)(1)(E)). It is also unlawful for any producer to fail to register with EPA the establishment location where a pesticide is produced. 7 U.S.C. §§ 136j(a)(2)(L) and 136e(a).

14.   A knowing violation of FIFRA's provisions is a Class A misdemeanor offense. 7 U.S.C. § 136l(b)(1).

15.   In addition to the Federal FIFRA registration program, many states have a registration system that requires that pesticides also be registered with the particular state.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

16.   EPA-CID and the EPA Office of Inspector General ("EPA-OIG") are conducting an ongoing criminal investigation of OCCS regarding the sale of unregistered and misbranded sanitizer products in violation of FIFRA. During the execution of a federal search warrant on May 29, 2020, agents learned that OCCS subscribes to the PROVIDER in order to store business records and other information electronically. As set forth in detail

below, I respectfully submit there is probable cause to believe
that the information associated with the SUBJECT ACCOUNT at the
PROVIDER constitutes evidence, contraband, fruits, or
instrumentalities of criminal violations of 7 U.S.C
§§ 136j(a)(1)(A) and (E), 136l(b)(1) (the sale or distribution
in the United States of an unregistered and misbranded
pesticide).

### IV.   <u>STATEMENT OF PROBABLE CAUSE</u>

17.   On April 17, 2020, EPA-CID's San Francisco Area Office
received information from the EPA civil enforcement division
regarding a tip and complaint alleging that OCCS sold an
unregistered and misbranded product. The complaint additionally
alleged that OCCS diluted a registered product.

18.   I have reviewed the California Secretary of State
website for business filings and found that OCCS incorporated in
California on January 7, 2002, and was given the entity number
C2495222 on January 10, 2003. In a filing dated August 20, 2018,
OCCS identified its address as 10680 Fern Avenue, Stanton,
California. Roman Leo Paradiso ("Paradiso") is listed as the
Chief Executive Officer, and Chief Financial Officer. Paradiso
is listed as one of the Directors of OCCS. I have reviewed
records from the Orange County Assessor's Office, and found that
the street address is identified as Assessor's Parcel Numbers
126-591-10 and 126-59-11.

19.   On April 17, 2020, EPA-OIG Special Agent ("SA")
Christopher Huntington interviewed the original complainant

("COMPLAINANT").[3] The COMPLAINANT stated that OCCS is allegedly diluting an EPA-registered pesticide product and selling it as a ready-to-use ("RTU") product called Ultra Clean Sanitizer/Quat Solution. On or about April 17, 2020, I reviewed the OCCS label provided by the COMPLAINANT. The label listed the active ingredients at 0.5%, which is ten times less concentrated than the original registered product, MAQUAT 10. The label provided by the COMPLAINANT listed the EPA Registration ID Number, 10324-63-74439, and EPA Establishment Number 74439-CA-01. The COMPLAINANT stated the concentrate is in high demand due to the pandemic and is in short supply. The COMPLAINANT further stated OCCS sells the Ultra Clean Sanitizer/Quat Solution for approximately $70 a case. Each OCCS case contains 12 quart-sized containers.  On or about April 27, 2020, the COMPLAINANT wrote to SA Huntington and me, "A similar ready to use sanitizer in a 12x1 quart case should sell in the low $20.00 range. We currently sell the concentrate version in a 4x1 gallon case at an avg cost of $33.00 per case.... Just one of these concentrated cases could make 2,048 ready to use sanitizer quart bottles." On or about May 8, 2020, EPA-OIG SA Huntington browsed various online retailers for the same EPA Registration No. starting with "10324-63" and provided me with the following information:

---

[3] Complainant is an employee of another chemical company that is a competitor of OCCS.

a.     SmartJan (smartjan.com) was selling EnvirOx's SSS Dish San, EPA Registration No. 10324-63-69268, for approximately $82.06 for two one-gallon containers.

b.     McDonald Paper Restaurant Supplies (mcdonaldpaper.com) was selling the one-gallon Diamond Cleaning Disinfectant Concentrate, EPA Registration No. 10324-63-4238, for approximately $44.99.

c.     The Cleaners Depot (thecleanersdepot.com) was selling SANI 100 by ChemTron, EPA Registration No. 10324-63-68921, for approximately $44 for one-gallon, with a limit of one per customer.

22.   I calculated that if one concentrated case at approximately $33.00 a case was purchased by OCCS to make approximately 2,048 quart bottles of Ultra Clean Sanitizer/Quat Solution, and then sold at $70 for 12 one-quart bottles, the seller (OCCS) would collect $11,946.66. This is a gain of approximately $11,913.66. This is approximately a 36,102% increase over the $33.00 investment for a case of concentrated product.[4]

MAQUAT 10 and EPA Registration Number 10324-63

23.   The EPA Office of Pesticide Programs ("OPP") registered MAQUAT 10 in March 1976 under EPA Registration Number 10324-63. On or about January 4, 2016, EPA approved an amended label submitted by Mason Chemical Company for MAQUAT 10.

---

[4] This does not account for costs associated with packaging such as labeling and containers.

24.  The MAQUAT 10 product is registered by EPA for use in many settings, including: airline terminals, airports, transportation terminals, public facilities, EMS & fire facilities, emergency vehicles, ambulances, police cars, fire trucks, police stations, courthouses, correctional facilities, municipal government buildings, prisons, jails, penitentiaries, correctional institutions, banks, churches, office buildings, federally inspected meat and poultry plants, food processing plants, food establishments, day care centers, schools, hotels, motels, restaurants, bars, hospitals, nursing homes, healthcare facilities, operating rooms, quarantine areas, ICU areas, patient care rooms and facilities, Emergency Rooms, newborn nurseries, neonatal units, and restrooms.[5] The approved label for

_____

[5] These are areas that are heavily impacted by the COVID-19 pandemic. For example, the Centers for Disease Control and Prevention (CDC)provides an "Interim Infection Prevention and Control Recommendations for Patients with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings." In the guidance, it states, "Ensure that environmental cleaning and disinfection procedures are followed consistently and correctly. / Routine cleaning and disinfection procedures (e.g., using cleaners and water to pre-clean surfaces prior to applying an EPA-registered, hospital-grade disinfectant to frequently touched surfaces or objects for appropriate contact times as indicated on the product's label) are appropriate for SARS-CoV-2 in healthcare settings, including those patient-care areas in which aerosol generating procedures are performed. /Refer to List N on the EPA website for EPA-registered disinfectants that have qualified under EPA's emerging viral pathogens program for use against SARS-CoV-2."

Additionally, the CDC's "Reopening Guidance for Cleaning and Disinfecting Public Spaces, Workplaces, Businesses, Schools, and Homes" states, for non-porous surfaces, "Consult EPA's list of approved products for use against COVID-19. This list will help you determine the most appropriate disinfectant for the surface or object. You can use diluted household bleach solutions if appropriate for the surface. Pay special attention to the personal protective equipment (PPE) that may be needed to safely apply the disinfectant and the manufacturer's recommendations concerning any additional hazards. Keep all disinfectants out of the reach of children. ... EPA approved disinfectants, when applied according to the manufacturer's label, are effective for use against COVID-19. Follow the instructions on the label

MAQUAT 10 indicates the product was evaluated and found to be effective against several viruses, including Human Coronavirus, on hard, non-porous environmental surfaces.

25.   The active ingredients in MAQUAT 10 are alkyl dimethyl benzyl ammonium chloride and alkyl dimethyl ethylbenzyl ammonium chloride. These active ingredients are known as quaternary ammonium compounds or "quats." Each of these active ingredients makes up approximately 5% of the contents of the product. These active ingredients form the basis for pesticidal claims regulated under FIFRA, specifically the sanitizing, virucidal, and fungicidal claims.

26.   On April 26, 2020, I reviewed the EPA's "List N," which identifies "Products with Emerging Viral Pathogens AND Human Coronavirus claims for use against SARS-CoV-2."[6] EPA Registration Number 10324-63, for the product named MAQUAT 10, is on List N. EPA's website states, "For example, if EPA Reg.

---

for all cleaning and disinfection products for concentration, dilution, application method, contact time and any other special considerations when applying."

   [6] The virus that causes COVID-19 is SARS-CoV-2. It is an "emerging viral pathogen," that is, a virus that was heretofore unknown. Because the occurrence of emerging viral pathogens is unpredictable versus established pathogens (e.g., norovirus or rhinovirus, a cause of the common cold), there are few, if any, EPA-registered disinfectant products (pesticides) that will be specifically tested and approved for use against these infectious agents until adequate research has been conducted. In addition, standards for laboratory testing may not have been developed. As a consequence, it may be difficult to assess the efficacy of EPA-registered pesticides against these viruses in a timely manner. In anticipation of the occurrence of emerging viral pathogens and based on experience from pandemic H1N1 and Ebola, on August 19, 2016, the EPA established a guidance to address means by which already established EPA-registered pesticides could be used against emerging viral pathogens, even if the pesticide had not been specifically tested and approved for that use.

No. 12345-12 is on List N, you can buy EPA Reg. No. 12345-12-2567 and know you're getting an equivalent product."

27.   Under FIFRA regulations, 40 C.F.R. § 152.132, a registrant may distribute or sell its registered pesticide under another company's name and address instead of, or in addition to, its own. Such distribution and sale is termed "supplemental distribution" and the product is referred to as a "supplemental registration" or "distributor product." Supplemental distribution is permitted upon notification to EPA if all the conditions set forth in Section 152.132 are met, including that the distributor product is not repackaged, and remains in the producer's unopened container, and that the label of the distributor product is the same as that of the registered product, with limited exceptions described in Section 152.132(d). Both the registrant and supplemental registrant, also referred to as subregistrant, also must comply with applicable state laws.

28.   MAQUAT 10 is sold under a variant of supplemental registration numbers. In order to comply with FIFRA, a subregistrant would be required to sell MAQUAT 10 as it was originally formulated, and under the regulatory conditions set forth in 40 C.F.R. § 152.132.

OCCS Quat Product

29.   On April 24, 2020, Brandon Boatman with EPA's Enforcement and Compliance Assurance Division ("ECAD") told me the following:

12

      a.   On or about April 17, 2020, he queried the EPA Section Seven Tracking System ("SSTS") database that contains, among other things, company numbers, establishment numbers, registration data, and annual pesticide product reports.

      b.   No companies were listed under EPA Establishment Number, 74439-CA-01, the number on the OCCS label provided by the COMPLAINANT.

      c.   The EPA Registration ID Number 10324-63-74439, the other number on the OCCS label provided by the COMPLAINANT, is for a supplemental distributor.

      d.   As a supplemental distributor, OCCS can distribute the exact same MAQUAT 10 product but cannot change the formulation. Once the formulation is changed, such as by dilution, that changes the product and it is an unregistered pesticide (refer to Paragraph 13). A supplemental distributor cannot change (e.g., dilute) the MAQUAT 10 product in any way, and has to meet the regulatory conditions set forth in 40 C.F.R. § 152.132.

30.   On or about April 24, 2020, Parissa Naef, Supervisor and Senior Environmental Scientist for the Enforcement Branch of the California Department of Pesticide Regulation ("DPR"), informed me that her records, from 2011 to present, show that DPR had not conducted an inspection of OCCS. DPR records indicate that "Sanitizer/Quat Solution Concentrate - 10%" was registered on May 21, 2012, with the registration number 10324-63-AA-74439.  There are no other 10324-63 registrations listed

for OCCS.[7] Naef later explained that prior to being registered with DPR, products must be registered with EPA.

31.  On or about April 27, 2020, I spoke to Scott McWhorter with EPA's ECAD. McWhorter told me that there are three relevant numbering systems: (1) the company number; (2) the supplemental distributor number; and (3) the establishment number. In order to be a supplemental distributor, OCCS had to register the company with EPA, which results in the company having a company number. OCCS's company number is 74439. The supplemental distributor number uses the registrant number and has the company number added to the end of it. EPA's records show that OCCS neither requested nor received an establishment number.

32.  McWhorter provided me with a record of the EPA Notice of Supplemental Distribution of a Registered Pesticide Product, Form 8570-5. The form lists the product as MAQUAT 10. The notice lists the distributor product name as "Ultra Clean Quality Cleaning Chemicals Sanitizer/Quat Solution Concentrate - 10%." The name of the distributor is listed as "O.C.C.S." The notice is signed and dated by Distributor "Roman Paradiso, President" on January 12, 2012 and by "Mandi Warner, Regulatory Assistant" for the Registrant, Mason Chemical Company, on February 16, 2012. Conditions on the form state the following:

> *1. The distributor product must have the same composition as the basic product.*

---

[7] There is an additional "MAQUAT" product listed with EPA, the MAQUAT 32 PD, registration number 10324-167. On May 21, 2012, OCCS obtained a DPR registration for Sanitizer/Quat Solution Concentrate - 1.56%" under registration number 10324-167-AA-74439.

*2. The distributor product must be manufactured and packaged by the same person who manufactures and packages the registered basic product.*
*3. The labeling for the distributor product must bear the same claims as the basic product, provided, however, that specific claims may be deleted if by doing so, no other changes to the label are necessary.*
*4. The product must remain in the manufacturer's unbroken container.*
*5. The label must bear the EPA registration number of the basic product, followed by a hyphen and the distributor's company number.*
*6. Distributor product labels must bear the name and address of the distributor qualified by such terms as "packed for ...", "distributed by ... ", or "sold by ..." to show that the name is not that of the manufacturer.*
*7. All conditions of the basic registration apply equally to distributor products. It is the responsibility of the basic registrant to see that all distributor labeling is kept in compliance with requirements placed on the basic product.*

On or about April 28, 2020, McWhorter provided me with additional Form 8570-5's for the MAQUAT 10 product with Paradiso's signature. The forms are dated May 19, 2012 and April 15, 2013. Based on this information and Paradiso's signatures on the notices, I believe Paradiso, the president of OCCS, is on notice that his product must have the same composition as MAQUAT 10, his product must be manufactured and packaged by Mason Chemical Company, his product must not be repackaged before being sold or distributed, changes to claims made on MAQUAT 10's label are restricted, and that the label must bear the EPA registration number of MAQUAT 10 followed by a hyphen and OCCS's company number.[8]

---

[8] Additional EPA 8570-5 forms on file with EPA were signed by Paradiso on May 14, 2012, and April 15, 2013.

33. McWhorter also told me that OCCS has not registered their current address with EPA as an establishment and therefore does not have an establishment number. OCCS needs its own unique establishment number in order to produce pesticides. OCCS cannot lawfully produce any pesticidal products at its Stanton, California facility. See, 7 U.S.C. § 136e(a).

34. On or about April 20, 2020, I spoke to Eric Miederhoff, Product Manager in the Antimicrobial Division of EPA OPP. Miederhoff oversees disinfectant registrations for EPA, such as MAQUAT 10. Miederhoff conducted a review of the label provided by the COMPLAINANT. He confirmed that what OCCS had on its label was not allowed by EPA. If the product is diluted, it is considered a formulation activity, and the product must be registered with EPA (refer also to Paragraphs 10 to 12). OCCS is not registered to formulate or dilute the product. Having only received a supplemental registration allowing it to be a distributor of MAQUAT 10, OCCS is only allowed to sell the product as the originally formulated concentrate, as was the case under the MAQUAT 10 labeling approved by EPA.

35. Miederhoff told me he had the following additional concerns with OCCS' sale of the product:

a. OCCS is not selling the EPA-approved formulation, i.e., MAQUAT 10. As a supplemental distributor, they are not allowed to modify the formulation before they distribute and sell it.

b. The MAQUAT 10 registration provides dilution directions (by the end user/purchaser) for different levels of

antimicrobial control. For hospitals/medical disinfection, the registration provides dilution instructions for four ounces of product per five gallons of water, which equals 625 ppm. For food contact sanitization, the registration provides dilution directions for two levels -- one or two ounces of product in four gallons of water to achieve either 200 or 400 ppm active in the solution. The concentration of the two active ingredients listed on the OCCS label provided by the COMPLAINANT (0.5% + 0.5%, for a total of 10,000 ppm) exceeds the tolerance exemption set by EPA for use of the product for hospitals/medical disinfection and for food contact sanitization. Food contact sanitization means for use on hard, non-porous surfaces in contact with food.

       i.   In my review of the MAQUAT 10 approved label, I noted that under the Precautionary Statements section it states, "HAZARDS TO HUMANS AND DOMESTIC ANIMALS / DANGER. Corrosive. Causes irreversible eye damage and skin burns. Harmful if swallowed, inhaled or absorbed through the skin. Avoid breathing spray mist. Do not get in eyes, on skin or on clothing. Wear goggles or face shield and rubber gloves and protective clothing when handling. Wash thoroughly with soap and water after handling and before eating, drinking, chewing gum, using tobacco or using the toilet. Remove contaminated clothing and wash clothing before reuse."

       c.   OCCS does not include directions for use for any of the uses on the label aside from disinfection. Sanitization,

virucidal, and fungicidal uses should have distinct directions for use. 40 C.F.R. § 156.10.

    d.   Miederhoff expressed concern for the safety of having 10,000 ppm of these active ingredients in the product, as compared with the tolerance level established for these chemicals pursuant to 40 C.F.R. § 180.940. That provision sets forth EPA's tolerance exemptions for active and inert ingredients for use in antimicrobial formulations, including the active ingredient chemicals here, DMBAC1 and DMEBAC1. Residues of these two chemicals are exempted from the requirement of a tolerance if the concentration of each chemical used in such antimicrobial formulation is 400 ppm or less.

36.  On or about April 28, 2020, I spoke with Susan Leslie ("Leslie") of Pilot Chemical Company ("Pilot"), who told me the following:

    a.   Pilot acquired Mason Chemical Company around January 2013.

    b.   Approximately a month ago, Leslie received notice that OCCS was taking MAQUAT 10 and promoting it as an RTU product. Leslie stated that this was not allowed. Pilot sent OCCS a cease and desist letter.

    c.   About a week or two ago, Leslie received additional information including a photograph of the OCCS RTU bottle.

    d.   Pilot immediately moved to cancel all OCCS registrations with EPA.

e.    Leslie stated they were sending a certified letter to OCCS, but had just received notice that the letter was being returned. Leslie stated the address they had on file for OCCS was located in Santa Fe Springs.

37.    On or about May 4, 2020, I reviewed documents provided to me by Pilot and learned the following information:

a.    On or about April 2, 2020, John M. Herrity, senior stewardship auditor for Pilot, sent an email to Roman Paradiso at roman@occsinc.com. The email was titled, "CEASE AND DESIST - Sanitizer/Quat Solution Ready to Use." The email stated the following:

> *My name is John Herrity and I'm the Stewardship Auditor at Mason Chemical. It has come to our attention via the attached label discovered in the marketplace that OCCS Inc. (EPA Co. No. 74439) is distributing an unauthorized and unregistered pesticide labeled as **Sanitizer/Quat Solution Ready to Use** with the EPA Reg. No. of 10324-63-74439. Mason Chemical (EPA Co. No. 10324) has never authorized you to produce this product, nor have we ever registered any such brand name on your behalf. Our Maquat 10 basic registration (EPA Reg. No. 10324-63) is not a ready-to-use formulation and is only allowed to be formulated and distributed as a concentrate in strict accordance with all applicable FIFRA regulations. You are currently in violation of numerous compliance issues which violate EPA and FIFRA regulations including, but not limited to, the misbranding and distribution of an unregistered pesticide.* **_Due to these issues, Mason Chemical does not authorize you to produce, package, market, distribute, or offer for sale this product, or any other misbranded or unregistered Mason Chemical affiliated products, or allow any other entities to perform these activities on your behalf. We also require any of this product still in OCCS Inc.'s control to be disposed of according to state, local, and federal regulations._** *I ask that you confirm receipt of this email.*

19

On April 6, 2020, Roman Paradiso replied:

> *What your [sic] looking at is a mocked up label, we sent to a customer from one of our salesman to see if it would work for their use. I have started the process with Tracey to get a RTU registration started. I do not want to do anything that would jeopardize our relationship. I will make sure nothing is produced until I get a registration from you guys.*

On April 7, 2020, Herrity replied:

> *Given the numerous compliance issues we ran across back in 2016 with OCCS in which Ms. Cher Daun issued a cease and desist, performed a desk audit, and subsequent physical audit due to failing the desk audit, we certainly have a heightened compliance focus around your company. In addition to the label we found in the marketplace, we also received word this product was being offered for sale for $72/case. During this pandemic, there is even a more heightened focus surrounding compliance of these registered products then normal as the EPA has released a memo and additional statements confirming that all applicable FIFRA regulations are still required to be followed. In addition, they announced specific and additional enforcement monitoring surrounding the manufacturing, distribution, and importation of these products, especially with regards to human health concerns at the end-use, applicator, and residential levels, even going so far as to say "EPA is also coordinating with the U.S. Department of Justice and other federal partners to bring the full force of the law against those selling fraudulent or unregistered products". Current FIFRA fines are just a shade under $20,000 per occurrence, meaning levied fines can easily reach six and seven figures. As the basic registrant, we can be held liable for our supplemental registrant's compliance infractions. I wanted to let you know that if we become aware of any major compliance violations from OCCS in the future, we will move forward with the cancellation of all registered business we have with OCCS as the potential liability for reoccurring compliance infractions certainly outweigh any potential benefits. If you have any questions regarding what is allowable under a supplemental registration, **please reach out to us and ask for guidance**.*

20

On April 7, 2020, Paradiso replied, "Understood. Thank you."

The Sale of the Unregistered Product and Alterations to Labeling

38.   On April 22, 2020, EPA-CID SA Daniel Chelko ("Chelko") conducted an undercover operation to purchase the reformulated RTU product from OCCS.  Following the undercover operation, SA Chelko told me the following:

a.    At OCCS, he spoke to an individual introduced as "Kenia."

b.    Kenia told him that OCCS usually sells larger quantities of the product to customers such as hospitals.

c.    Kenia told him that the OCCS RTU product kills coronavirus.[9]

d.    Kenia confirmed the product was made on-site in the back of the OCCS facility.

e.    He purchased three boxes of 32-oz. bottles of "sanitizer" at $72 a box.

f.    During the undercover operation, SA Chelko noted glass doors in the front of the building that led to a waiting area with a door and reception window on the right. Behind the reception is a wide-open area with a desk and shelf. He also noted a hallway with more offices. To the side of the main building is a warehouse. The warehouse is separated by a wall into two sections. SA Chelko noted an additional office in the warehouse.

---

[9] Virucidal claims are antimicrobial in nature and are regulated under FIFRA. See 7 U.S.C. §§ 136(mm).

g.    OCCS sold the unregistered pesticidal product to the undercover SA Chelko, contrary to what Paradiso previously represented to Pilot (see Paragraph 36).

39.   Based on my review of the EPA-approved MAQUAT 10 label, and the OCCS RTU label purchased by SA Chelko, I noted the following:

a.    The bottles purchased on April 22, 2020 by SA Chelko, were packaged with different labels from what was provided by the COMPLAINANT. The new labeling of the product purchased by SA Chelko changed the name from "Sanitizer/Quat Solution Ready to Use", to "Quat Solution Ready to Use Cleaner."

b.    The labeling also removed the supplemental EPA registration number from the front, but still references the EPA registration number for MAQUAT 10 as part of the product explanation.

c.    The active ingredients alkyl dimethyl benzyl ammonium chloride and alkyl dimethyl ethylbenzyl ammonium chloride are listed on the label at 0.04% each.

40.   As a result, I have concluded that OCCS's sale of these bottles to SA Chelko constitutes a sale of an unregistered and misbranded pesticide in violation of 7 U.S.C. § 136j(a)(1)(A) and (E).

41.   The EPA-approved MAQUAT 10 label has specific instructions for use of the product in various settings, whereas the OCCS RTU product purchased by SA Chelko does not provide dilution instructions or contact times, meaning how long the product needs to stay on a surface to be effective. The label

22

does not differentiate between settings and further states, "For use as a cleaner in food plants, food establishments, food areas, equipment, homes, hospitals, nursing homes, health care institutions, schools, food services, and farms." The MAQUAT 10 label specifically has instructions of a 10-minute contact time for hospital or medical environment claims, and for public health virucidal claims. The contact times for usage varies from one minute to ten minutes. Again, the OCCS RTU does not differentiate or give contact times.

42.  Additionally, if a purported total 1% active ingredient concentration on the label provided by the COMPLAINANT is the equivalent of 10,000 ppm (refer to Paragraph 34.b), the purported 0.08% total active ingredient concentration (0.04% + 0.04%) on the label obtained by SA Chelko is the equivalent of 800 ppm.[10] 800 ppm still exceeds the active ingredient level approved by EPA for the MAQUAT 10 product related to hospital or medical environment claims, public health virucidal claims, fungicidal claims, and mold and mildew claims.[11]  Thus, the efficacy and safety of this higher level, which differs from the level EPA approved through the MAQUAT 10 registration process, has not been evaluated nor approved by the EPA.

---

[10] 1.0% = 10,000 ppm ; 10,000 ppm/X ppm = 1%/0.08% ; 10,000 ppm/X ppm = 12.5 ; X ppm = 10,000 / 12.5 ; X = 800 ppm

[11] The MAQUAT 10 active ingredient level and use directions for these claims is 4 ounces for every 5 gallons of water, and 10 minutes of contact time. 4 ounces for 5 gallons is approximately 625 ppm.

43.  On or about May 8, 2020, I spoke to Dr. Kristen
Keteles, a toxicologist with EPA's National Enforcement
Investigations Center ("NEIC"), who told me the following:

a.    A product that may appear at first to be exactly
like a registered product often will fail the efficacy test
(refer to Paragraph 10) because, for example, an inert
ingredient can block the efficacy of an active ingredient. The
only way to know the efficacy of a product is for that product
to go through the EPA OPP FIFRA registration process which
includes the performance of testing.

b.    Companies going "rogue," even if they are basing
their products on existing products, pose a problem because the
efficacy of the product is unknown, and potentially may result
in unintended health impacts.

c.    FIFRA's registration process exists to protect
consumers and the public and, if the registration process is not
followed, EPA cannot ensure public safety.

44.  On or about May 5, 2020, I received a report from EPA
NEIC Chemist Daniel Hurlbut, who provided me with the following
information:

a.    Hurlbut did an analysis of the containers that
were purchased by SA Chelko on or about April 22, 2020.

b.    Hurlbut's report states, "According to the
container labels, the active ingredients in this cleaning
product included 0.04 percent (%) alkyl (C12, C14, C16, C18)
dimethy benzyl ammonium chloride (""DMBACl) compounds and 0.04%

24

alkyl (C12, C14) dimethyl ethylbenzyl ammonium chloride ("DMEBACl") compounds."

c.    The report also provides, "The removal of the product label from Container #1 revealed another label attached to the container. The product name on this inner label was "Sanitizer/Quat Solution Ready to Use," and an EPA registration number (10324-63-74439) was present. The active ingredient content listed on this label was 0.5% DMBACl compounds and 0.5% DMEBACl compounds." (Affiant note: This second label lists the same active ingredient content as the label that was previously provided by the COMPLAINANT).

d.    Hurlbut's analysis of the active ingredients showed a range of 0.054% to 0.028% for total DMBACl content, and a range of 0.056% to 0.031% for total DMEBACl content, despite the label listing each of the two active ingredients at 0.04% in the bottle.[12]

---

[12] Certified limits are required for each active ingredient, per 40 C.F.R. § 158.350, and testing of the OCCS product purchased by SA Chelko shows that the concentration of the product's active ingredients vary greatly. Unless otherwise approved by EPA pursuant to the FIFRA registration process, for an ingredient present in a formula at less than or equal to 1.0%, the allowed deviation is plus or minus 10% of the "nominal concentration" (i.e., the amount of the ingredient expected to be present, per 40 C.F.R. § 158.300). Therefore, even assuming that the OCCS product had been legitimately registered with and approved by EPA, which it is not, the product must be within that specific range unless otherwise approved. Thus, for a product whose label states 0.04% for each active ingredient, such as the OCCS product purchased by SA Chelko, the standard certified limits as set forth in the regulation would be 0.036% to 0.044% for each active ingredient. As demonstrated through NEIC's sampling, the concentration of active ingredients in the OCCS product have been found to be outside of the standard certified limits.

45.   On or about April 23, 2020, Miederhoff also conducted a review of the labeling obtained by SA Chelko on April 22, 2020, and provided me with the following information:

a.   Miederhoff stated the labeling was problematic. Namely, the labeling refers to pesticides, and the disposal of pesticides, but lacks a proper EPA registration number for the product itself.

b.   There is the reference to MAQUAT 10, meaning it is a pesticidal product, even though the labeling does not declare this explicitly. The name of the product is "Quat Solution" implying it is a form of MAQUAT 10.

c.   Miederhoff stated OCCS is an unregistered establishment manufacturing an unregistered pesticidal product.

46.   I concluded that this constitutes a violation of 7 U.S.C. § 136e and 7 U.S.C. § 136j(a)(1)(A).

<u>Distribution of the Unregistered Product by OCCS</u>

47.   During the undercover purchase of the product on April 22, 2020, OCCS employee "Kenia" told SA Chelko that OCCS can ship products. She told SA Chelko that if a person from outside of California wished to purchase this product, they would have to contact OCCS via their customer service email, customerservice@occsinc.com and inquire about placing the order.

48.   On April 23, 2020, I created an undercover email account and sent an email to customerservice@occsinc.com asking for additional information on the Quat product and inquired about shipping to New Mexico. The reply was sent by "Kenia

Barragan," and provided the company phone number and a cellular
phone number.

49.   On April 24, 2020, at my direction, EPA-CID SA James
Mercier acting in an undercover capacity located in Denver,
Colorado, called the OCCS phone number, (714) 816-3040, and
spoke with "Kenia" via telephone. The SA Mercier told me the
following regarding his call with Kenia:

a.   SA Mercier stated he had traded emails the prior
day with her.

b.   When asked, Kenia stated she, "was not familiar
with the MAQUAT 10 product."

c.   She said the product, which SA Chelko purchased
on April 22, 2020, is a disinfectant and it can be placed on any
type of hard surface. Kenia stated the product "actually has the
coronavirus listed on there as one of the primary things as
well." Kenia stated the company can ship to New Mexico. She told
SA Mercier the product is RTU.

d.   Kenia further told SA Mercier that OCCS was
producing approximately 1,200 bottles a day.

e.   Kenia stated most of their clientele is corporate
janitorial and that, "The product is being distributed to
numerous places whether it, you know, it's hospitals and stuff,
or even restaurants."

f.   At the conclusion of the phone call SA Mercier
asked for additional information to be sent via email. The
undercover email received a "Technical Bulletin" from Barragan
at customerservice@occsinc.com. The bulletin had OCCS listed at

the bottom. The information at the top of the brochure stated,
"SANITIZER/QUAT RTU," and "READY TO USE SANITIZER - FOOD GRADE -
EPA REGISTERED." (Agent note: This is a false statement because
the OCCS RTU Quat product is not EPA registered).

50.   I have determined that if OCCS is producing
approximately 1,200 bottles a day, as stated by Kenia, and there
are 12 one-quart containers per case, OCCS is producing enough
product to fill 100 cases a day. At approximately $70 per case
(see Paragraph 18) to $72 per case (see Paragraph 37.e), that is
approximately $7,000 to $7,200 a day. If the facility is
operating at a conservative five days a week, and there are 22
weekdays days in April 2020, that amounts to $154,000 to
$158,400 in April 2020 alone for the sale of a misbranded and
unregistered product.

Search Warrants

51.   On May 28, 2020, the Hon. Charles F. Eick signed a
search warrant authorizing the search and seizure of information
associated with accounts identified as roman@occsinc.com and
customerservice@occsinc.com that are within the possession,
custody, or control of Microsoft Corporation (See Case No. 20-
MJ-2436). I executed the search warrant that same day.

52.   Also on May 28, 2020, the Hon. Charles F. Eick signed
a search warrant authorizing the search of OCCS's business
premises for evidence, contraband, fruits, and/or
instrumentalities of the same FIFRA violations described above
(See Case No. 20-MJ-2432). During the execution of that search
warrant on May 29, 2020, agents learned from OCCS employee M.S.

that Paradiso directed her to scan and then shred various business documents as needed, typically once a week, and that most records are stored electronically. During an interview with Paradiso, agents also learned that OCCS subscribes to the PROVIDER and that business documents are kept on the SUBJECT ACCOUNT in the PROVIDER's "cloud."

53.   On May 29, 2020, SA Huntington sent the PROVIDER a preservation letter requesting that information associated with the SUBJECT ACCOUNT be preserved for 90 days pursuant to 18 U.S.C. § 2703(f).

54.   I reviewed documents provided by the PROVIDER on June 11, 2020, and learned the following regarding the SUBJECT ACCOUNT:

> a.   Customer name: Orange County Chemical Supply;
>
> b.   Subscriber account number: 871265;
>
> c.   Length and type of hosting: January 5, 2009 to present for dedicated hosting; and
>
> d.   Contact: Roman Paradiso, roman@occsinc.com.

55.   Other than what has been described herein, to my knowledge the United States has not attempted to obtain the contents of the SUBJECT ACCOUNT by other means.

## V.   TRAINING AND EXPERIENCE REGARDING SERVER HOSTING AND COLOCATION FACILITIES

56.   Based on my training and experience, and from conversations with other law enforcement officers, I know the following regarding server hosting and colocation facilities such as the PROVIDER:

a.    A data center such as that operated by the
PROVIDER is a facility that offers a range of services to the
public, including colocated dedicated servers, cloud hosting,
and Virtual Private Servers ("VPS").

b.    In general, a co-location data center is a
facility in which a business can rent physical space,
particularly for computing hardware.  Generally, a colocation
data center will have numerous customer companies' servers
occupy a single location with segregated areas or floors
dedicated to each business.  A colocation data center generally
provides operational services, such as power, cooling, and
physical security to their customers.

c.    A VPS provider may lease physical space within a
colocation data center or may own its own space.  A VPS can own
hundreds of computers.  Each of these computers can in turn be
configured to run multiple "virtual machines."  A virtual
machine runs a separate operating system on the same computer,
which allows a single computer to behave like multiple
individual computers.  In total, such a business can be
operating thousands of computers in a relatively small space.

57.  The customers of these facilities place files,
software code, databases, and other data on the servers hosted
by the service.  To do this, customers connect from their own
computers to the server computers across the Internet.  This
connection can occur in several ways.  In some situations, it is
possible for a customer to upload files using a special web site
interface offered by the hosting company.  It is frequently also

possible for the customer to directly access the server computer through the Secure Shell ("SSH") or Telnet protocols.  These protocols allow remote users to type commands to the server. The SSH protocol can also be used to copy files to the server. Customers can also upload files through a different protocol, known as File Transfer Protocol ("FTP").  Servers often maintain logs of SSH, Telnet, and FTP connections, showing the dates and times of the connections, the method of connecting, and the IP addresses of the remote users' computers.  Servers also commonly log the port number associated with the connection.  Port numbers assist computers in determining how to interpret incoming and outgoing data.  For example, SSH, Telnet, and FTP are generally assigned to different ports.  A customer or subscriber of a provider can also store with the provider files, such as visual basic scripts, SSH and FTP commands, domain registrations, malware toolkits, notes, and other files, on servers maintained and/or owned by the provider.  In my training and experience, evidence of who was using an account may be found in such information.

a.    The servers use those files, software code, databases, and other data to respond to requests from Internet users for data or other resources from the server.  Commonly used terms to describe types of files sent by a server include HyperText Markup Language ("HTML") (a markup language for web content), Cascading Style Sheets ("CSS") (a language for styling web content), JavaScript (a programming language for code run on the client's browser), and image files.

31

b.   Because each computer (virtual or physical) owned by a VPS provider may be assigned to a different customer and because each customer is likely to need varying levels of internet access, a VPS provider will generally assign a static (constant) IP address to each computer if the customer needs continued access to the internet, rather than a dynamic (temporary, changing) IP address.  Furthermore, even if the computer is assigned a dynamic IP address, the VPS provider generally has records of which computer was using the dynamic IP address when provided with a time stamp associated with an IP address.  In this case, based on the duration of the IP lease and type of usage, I understand the IP address to be functionally static.

58.  In addition to the information stored on the relevant computer, providers of virtual private servers, colocation data servers, and similar services will maintain information about the subscribers of their services, and accounts like the SUBJECT ACCOUNT.  Subscribers obtain an account by registering with the provider.  During the registration process, providers generally ask their subscribers to provide certain personal identifying information when registering for a virtual private network ("VPN"), domain, or website.  Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number, online payment information, or cryptocurrency wallet).  Some providers also maintain a record

32

of changes that are made to the information provided in subscriber records, such as to any e-mail addresses or phone numbers supplied in subscriber records.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of an account.

59.  Further, in my training and experience, providers of VPS's, colocation data servers, and other similar services typically retain certain transactional information about the creation and use of each account on their systems.  This information can include the date on which the account was created, the length of service, records of login (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  In addition, such providers often have records of the IP address used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the SUBJECT ACCOUNT.

60.  In my training and experience, users of VPS's, colocation data servers, and similar services will sometimes communicate directly with the service provider about issues relating to the account, such as technical problems, billing

inquiries, or complaints from other users.  Providers typically
retain records about such communications, including records of
contacts between the user and the provider's support services,
as well records of any actions taken by the provider or user as
a result of the communications.  In my training and experience,
such information may constitute evidence of the crimes under
investigation because the information can be used to identify
the user(s) of the SUBJECT ACCOUNT.

61.  I know from my training and experience that the
complete contents of an account may be important to establishing
the actual user who has dominion and control of that account at
a given time.  Accounts may be registered in false names or
screen names from anywhere in the world with little to no
verification by the service provider.  They may also be used by
multiple people.  Given the ease with which accounts may be
created under aliases, and the rarity with which law enforcement
has eyewitness testimony about a defendant's use of an account,
investigators often have to rely on circumstantial evidence to
show that an individual was the actual user of a particular
account.  Only by piecing together information contained in the
contents of an account may an investigator establish who the
actual user of an account was.  Often those pieces will come
from a time period before the account was used in the criminal
activity.  Limiting the scope of the search would, in some
instances, prevent the government from identifying the true user
of the account and, in other instances, may not provide a
defendant with sufficient information to identify other users of

34

the account.  Therefore, the entire contents of a given account often provides important evidence regarding the actual user's dominion and control of that account.  For the purpose of searching for content demonstrating the actual user(s) of the SUBJECT ACCOUNT, I am requesting a warrant requiring the PROVIDER to turn over all information associated with the SUBJECT ACCOUNT with the date restriction included in Attachment B for review by the search team.

62.  Relatedly, the government must be allowed to determine whether other individuals had access to the SUBJECT ACCOUNT.  If the government were constrained to review only a small subsection of an account, that small subsection might give the misleading impression that only a single user had access to the account.

63.  This application seeks a warrant to search all responsive records and information under the control of the PROVIDER, which is subject to the jurisdiction of this court, regardless of where the PROVIDER has chosen to store such information.

64.  As set forth in Attachment B, I am requesting a warrant that permits the search team to keep the original production from the PROVIDER, under seal, until the investigation is completed and, if a case is brought, that case is completed through disposition, trial, appeal, or collateral proceeding.

a.  I make that request because I believe it might be impossible for a provider to authenticate information taken from

the SUBJECT ACCOUNT as its business record without the original
production to examine.  Even if the provider kept an original
copy at the time of production (against which it could compare
against the results of the search at the time of trial), the
government cannot compel the provider to keep a copy for the
entire pendency of the investigation and/or case.  If the
original production is destroyed, it may be impossible for the
provider to examine a particular document found by the search
team and confirm that it was a business record of the provider
taken from the SUBJECT ACCOUNT.

        b.   I also know from my training and experience that
many accounts are purged as part of the ordinary course of
business by providers.  For example, if an account is not
accessed within a specified time period, it -- and its contents
-- may be deleted.  As a consequence, there is a risk that the
only record of the contents of an account might be the
production that a provider makes to the government, for example,
if a defendant is incarcerated and does not (perhaps cannot)
access his or her account.  Preserving evidence, therefore,
would ensure that the government can satisfy its Brady
obligations and give the defendant access to evidence that might
be used in his or her defense.

## VI.  <u>CONCLUSION</u>

65.  Based on the foregoing, I request that the Court issue the requested warrant.

_____
Wendy Su, Special Agent
U.S. Environmental Protection Agency
Criminal Investigation Division

Subscribed to and sworn before
me on July 10th, 2020.

_____
HONORABLE JOHN E. MCDERMOTT
UNITED STATES MAGISTRATE JUDGE

37